JASON M. SKAGGS (NO. 202190)
SKAGGS FAUCETTE LLP
Email: jason@skaggsfaucette.com
530 Lytton Avenue, 2nd Floor
Palo Alto, CA 94301
Telephone: 650/617-3226
Facsimile: 650/644-0200

Attorneys for DEFENDANTS FEKKAI RETAIL, LLC and BLUE MISTRAL, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIREYA RIOS, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>FEKKAI RETAIL, LLC, a New York Limited Liability Company, BLUE MISTRAL, LLC, a Delaware Limited Liability Company, and Does 1-10, inclusive,<br><br>Defendants. | No. 2:20cv-08742-PA-MRW<br><br>**(1) DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>**(2) DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**Under Separate Cover**<br><br>**(3) DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**<br><br>**(4) DEFENDANTS' INDEX OF EVIDENCE SUBMITTED IN SUPPORT OF MOTION AND MOTION FOR SUMMARY JUDGMENT (CONSISTING OF DECLARATION OF JASON M. SKAGGS AND EXHIBITS ATTACHED THERETO)**<br><br>**(5) [PROPOSED] JUDGMENT**<br><br>Judge: Hon. Percy Anderson<br>Date: June 28, 2021<br>Time: 1:30 p.m.<br>Courtroom: 9A<br>Trial Date: August 31, 2021 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 28, 2021 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9A, Ninth Floor, First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012 Defendants Blue Mistral, LLC and Fekkai Retail, LLC will, and hereby do, move the Court for summary judgment under Federal Rule of Civil Procedure 56(b) on each and all of Plaintiff's four causes of action in their operative Second Amended Complaint ("SAC") (for (1) common law misappropriation of name and likeness; (2) violation of California Civil Code §3344 (prohibiting the knowing use for commercial purposes of another's name or likeness without consent); (3) unfair competition under Cal. Business & Professions Code §17200 et seq.; and (4) violation of the Lanham Act (15 U.S.C. §1125) based on purported false endorsement) on the grounds that there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

*First*, the undisputed material facts establish that Plaintiff cannot prove an element essential to each of her four claims, which is lack of consent to the uses of her name, image, likeness or brand arising from the Content Shoot described in her SAC. (See, e.g., SAC ¶¶34, 41, 48, 55).

*Second*, with respect to the Lanham Act claim, summary judgment is appropriate for additional reason that the fundamental basis for Plaintiff's claim is for "false endorsement" and she indisputably had agreed to endorse Fekkai and its products. This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the Declaration of Jason M. Skaggs, all pleadings and files in this matter, all matters of which this Court may take judicial notice, and upon such other and further oral or documentary evidence as may be presented to the Court at or prior to the hearing on this Motion.

//

Pursuant to L.R. 7-3, Plaintiff's counsel John Baldivia and I discussed the motions on several occasions in May including most recently on May 24 wherein we agreed to file the motions, which would be due on May 31, early, on May 28 due to the Memorial Day Holiday. (He subsequently told me that he may not file his motion until later in the weekend).

SKAGGS FAUCETTE LLP

By: /s/
JASON M. SKAGGS

Attorneys For Defendants
Fekkai Retail, LLC And Blue Mistral, LLC

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 2

SUMMARY JUDGMENT STANDARD ................................................................ 5

LEGAL ARGUMENT ............................................................................................. 5

I.  Summary Judgment Should Be Granted To Defendants On Each Of Plaintiff's Claims Because She Cannot Establish The Essential Element Of Lack Of Consent To The Use Of Her Name Or Likeness. ............................ 5

II. In Addition To Failing To Establish A Lack Of Consent, Summary Judgment Should Be Granted To Defendants On Ms. Rios' Lanham Act Claim For The Additional Reason That She Was Already Endorsing The Very Brand That She Now Claims Was Falsely Representing Her Endorsement. ................................................................................................. 8

CONCLUSION ........................................................................................................ 9

# TABLE OF AUTHORITIES

## Cases

*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000) .......................... 9

*Celotex Corp. v. Catrett*, 477 U.S. 317(1986) .................................................................. 5

*Hicks v. PGA Tour*, 897 F.3d 1109 (9th Cir. 2018) .......................................................... 6

*Hill v. NCAA,* 7 Cal. 4th 1 (1994) ....................................................................................... 6

*Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108 (C.D. Cal. 2011), *aff'd,* 489 F. App'x 155 (9th Cir. 2012) .................................................................................... 6, 8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ............................................................................................... 7

*Local TV, LLC v. Superior Ct.*, 3 Cal. App. 5th 1 (2016) ................................................. 5

*Newton v. Thomason,* 22 F.3d 1455 (9th Cir.1994) ..................................................... 6, 8

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190 (N.D. Cal. 2014) .................................. 8

## Statutes

15 U.S.C. §1125 ............................................................................................................ 2, 8

Cal. Bus. & Prof. Code §17200 .................................................................................... 2, 5

Cal. Civ. Code §3344 ................................................................................................ 2, 5, 6

## Other Authorities

12 Oxford English Dictionary 713 (2d ed. 1989) ............................................................. 7

American Heritage Dictionary 1411 (4th ed. 2000) ......................................................... 7

Rest.3d Unf. Comp. § 46, cmt. f ........................................................................................ 6

Webster's Third New International Dictionary 1827 (2002) ............................................ 7

## Rules

Fed. R.Civ. P. 56 ............................................................................................................... 5

# INTRODUCTION

In 2019, Plaintiff Mireya Rios was an aspiring social media "influencer" who had lifetime earnings of approximately $2,000 before she was introduced to Defendants Fekkai Retail, LLC and Blue Mistral LLC[1] took a chance on Ms. Rios later in 2019, hiring her for small engagements and then agreeing to pay her $3,166 per month for use of her image and likeness in a wide range of advertising and social media channels. Ms. Rios has parlayed the exposure that she received from Fekkai into additional opportunities and has seen her income skyrocket as a result. Rather than being grateful to Fekkai for launching her career, Ms. Rios has turned around and sued the company based on the theory that Fekkai used her name and likeness outside the scope of their agreement and claims that this purportedly unauthorized use somehow damaged her "brand." Ms. Rios' case has no merit because she cannot establish an essential element of each her claims--lack of consent to the purportedly unauthorized use of her name and likeness. The undisputed facts establish that:

- Ms. Rios had an agreement to use her name and likeness and was paid well by Fekkai for those rights;
- Ms. Rios voluntarily appeared at the "Content Shoot" in Los Angeles in January 2020 where the footage at issue was taken;
- Ms. Rios was aware she was being filmed and photographed at this photo shoot and indeed posed and acted in the videos and photos;
- Ms. Rios was aware that the footage would be utilized by Fekkai to promote its products;
- Ms. Rios learned that the footage was in fact being utilized by Fekkai in early March 2020; and
- Ms. Rios she did not object to any of this until late April 2020, after Fekkai attempted to renegotiate its agreements with Ms. Rios and other influencers due to the Covid-19 pandemic.

---

[1] Blue Mistral is the managing member and parent company of Fekkai. For ease of reference, we will simply refer to "Fekkai," the name of the brand at issue, as the parties have done throughout this case, unless otherwise noted.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT        2:20CV-08742-PA-MRW
-1-

Plaintiff's operative Second Amended Complaint ("SAC") contains four causes of action: (1) common law misappropriation of name and likeness; (2) violation of California Civil Code §3344 (prohibiting the knowing use for commercial purposes of another's name or likeness without consent); (3) unfair competition under Cal. Business & Professions Code §17200 et seq.; and (4) violation of the Lanham Act (15 U.S.C. §1125) based on purported false endorsement. Under the undisputed facts of this case, summary judgment is appropriate to dispose of each of these claims arising from right of publicity due to Plaintiff's inability to establish the essential element of lack of consent. *See* Part I. The Lanham Act "false endorsement" claim is subject to summary judgment for the additional and independent reason that Plaintiff cannot satisfy the essential element of a "false" endorsement given that she had agreed to endorse, and was actively endorsing, Defendants' product and brand. *See* Part II.

## FACTUAL BACKGROUND

In the summer of 2019 Mireya Rios was an aspiring influencer who had made almost no money. According to Ms. Rios, during that year and possibly going back to 2018, her career as an influencer consisted of three engagements for the use of her name and likeness that resulted in payments of a few hundred dollars each totaling approximately $2,000. Undisputed Fact ("UF") 1. However, in August 2019, Ms. Rios met Sanjana Arefin, who managed social media and influencer relationships for Fekkai, and Ms. Arefin agreed that Fekkai would pay Ms. Rios $700 for Ms. Rios to promote Fekkai on Instagram. UF 2. Ms. Rios, understandably thrilled to actually make money as an influencer, told Ms. Arefin she was "[e]xcited about this-Thanks for the opportunity." UF 3. Moreover, as Ms. Rios explained in her deposition, she had been familiar with Fekkai for ten years, "really liked the brand," "thought it was a prestige brand," and "was excited to work with Fekkai." *Id*. Apparently sensing potential traction, Ms. Rios repeatedly followed up thereafter, buying Ms. Arefin an expensive gift, telling Ms. Arefin on October 8, 2019 that she would "love to be considered for any upcoming campaigns," suggesting they "meet asap," and pressing again the

following week with "a little proposal for Fekkai, would looove to keep working together." UF 4.

As Ms. Rios's friendship with Ms. Arefin blossomed, Ms. Arefin and Ms. Rios agreed on a longer-term arrangement whereby Fekkai would pay Ms. Rios far more in one month than she had earned from all other companies combined in her entire career. UF 5. In particular, they agreed that Fekkai could use Ms. Rios' name and likeness and would pay her $3,166 per month for a year starting on January 1, 2020. *Id.*. This partnership, which Ms. Rios described as "very exciting for me" Id., was reflected in a Services Agreement sent by Ms. Arefin to Ms. Rios on December 17, 2019 on Fekkai letterhead naming the parties as Blue Mistral and Ms. Rios. *Id.* This Agreement included a "grant of rights" that provided Blue Mistral (among other things):

> Solely in connection with the Services throughout the Term and in connection with the campaign only, and in the distribution channels expressly set forth on Exhibit A, Influencer hereby grants to Brand (a) the limited, non-exclusive, non-transferable, non-assignable right and license to publish Influencer's name, approved biography, approved image and approved likeness (collectively, "Likeness"), hometown, persona, partnership participation, and biographical data, and (b) the exclusive right and license to use, repurpose, "repost", "share", and "regram" on Brand's owned and operated social media channels, as well as for paid social media support for 12 months (eg. "sponsored" posts or "whitelisting"), and paid advertising through online, digital, and traditional platforms for 12 months (eg. Client's owned and operated websites, email newsletters, display ads, television, etc.) without substantive modification of the content provided by Influencer as specified in this Agreement (collectively, "Content"). UF 7.

In addition, a "Cross Promotion" provision, located just above the monthly rate of $3,166 in the Agreement, provided that

> Talent grants Blue Mistral permission to use images provided by Talent for paid and digital advertising purposes described in Section 4 ("Grant of Rights") with usage rights for 12 months. Talent also grants Blue Mistral permission to use images provided by Talent across Blue Mistral owned social channels and also engage, share, and re-post images from Talent's social channels. Content can

be used and repurposed at the discretion of the brand but effort to tag and mention Influencer will be made where possible. (UF 8)

Ms. Rios responded to the email by stating "[T]his all looks great to me!" and that she was "VERY excited about this partnership thank you soo much!"; she also testified that there was nothing in the contract that concerned her. UF 6. Ms. Rios had an attorney look at the agreement and he provided comments on January 2, 2020, but the attorney did not suggest any substantive changes to the Grant of Rights or Cross Promotion provision, and Ms. Rios testified that neither she nor her attorney had any concerns about either of those provisions. UF 9. While the Services Agreement was never signed, the parties performed under the Services Agreement for several months, including payments made by Fekkai thereunder.[2] UF 10.

In January 2020, Ms. Rios participated in a Content Shoot in Los Angeles over the course of two days, and images and video from the Content Shoot were utilized on billboards in Minneapolis for two weeks as well as on some of Fekkai's social media channels and paid advertising. UF 11. Ms. Rios acknowledged in her deposition that all of the uses of the images and video were permissible under the Grant of Rights and Cross Promotion provision in Services Agreement, but claims that they are unauthorized and fell outside of the scope of the Services Agreement because the footage was taken by videographers and photographers hired by Fekkai at the Content Shoot and therefore were not "provided" by her. UF 16.

The Covid-19 pandemic hit in March 2020, therefore sought to renegotiate its agreements with influencers including with Ms. Rios. UF 17. During that process, during which Ms. Rios raised (through her attorney), the notion that she had some objections related to the Content Shoot and the use of the videos and images from the Content Shoot (UF 18), the parties agreed on a revised Services Agreement that lowered the monthly fee for Ms. Rios to $2,000 for the remainder of the year in exchange

---

[2] Any issue of whether the parties were operating under the December 17 version provided by Fekkai or the January 2 version as redlined by Ms. Rios' attorney is irrelevant given that the Grant of Rights and Cross-Promotional provisions were not substantively different as between the two documents.

different deliverable requirements. UF 19. Even though Ms. Rios's issues with the Content Shoot and the usage of the footage from that shoot had been raised at that point, neither Ms. Rios nor her attorney suggested any substantive changes whatsoever to the Grant of Rights or the Cross Promotion provision, and this was acceptable to Ms. Rios. UF 20. The parties could not resolve the instant dispute; Ms. Rios was paid through June and has no unpaid invoices outstanding. UF 21. Ms. Rios then hired the Pierce Law Group to litigate her complaints.

## SUMMARY JUDGMENT STANDARD

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

## LEGAL ARGUMENT

**I.     Summary Judgment Should Be Granted To Defendants On Each Of Plaintiff's Claims Because She Cannot Establish The Essential Element Of Lack Of Consent To The Use Of Her Name Or Likeness.**

All of Ms. Rios' claims are based on the same theory of lack of consent of the uses of her name or likeness arising from the Content Shoot (SAC ¶¶34, 41, 48, 55) and all of her claims fail because she cannot prove this lack of consent. *See Local TV, LLC v. Superior Ct.*, 3 Cal. App. 5th 1 (2016) at 7-8 (lack of consent is essential element of claim of common law misappropriation of name and likeness (First Cause of Action)), at 13 (claim under Civil Code §3344 requires proof of all elements of common law cause of action including lack of consent), at 14 (unfair competition/§17200 claim based on the same conduct underlying common law and section 3344 misappropriation claims fails if Plaintiff cannot establish lack of consent to the purportedly unauthorized

use); *Hicks v. PGA Tour*, 897 F.3d 1109, 1120 (9th Cir. 2018) (plaintiffs failed to state a Lanham Act false endorsement claim because they consented to the use at issue and such a claim requires an "unauthorized" use).

"Consent to use a name or likeness need not be express or in writing, but it may be implied from the consenting party's conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113 (C.D. Cal. 2011), *aff'd,* 489 F. App'x 155 (9th Cir. 2012).[3]  Here, Ms. Rios' consent was express and in writing, and can *also* be implied from her conduct and the circumstances of the case.

The court in *Jones* found that the plaintiff could not establish lack of consent where she chose to walk down the red carpet knowing photographers would take her picture and was aware that the photographs would display the images, and there was no evidence that the plaintiff conveyed any indication that the scope of her consent was limited.  *Jones*, 815 F. Supp. at 1113-14.  Here, evidence of consent is even more compelling.

Moreover, it is undisputed that the parties understood that they were operating under the terms of the Services Agreement notwithstanding the fact that it was not signed (UF 10), and indeed the Grant of Rights and Cross-Promotion provision were not substantively changed or discussed in any of the iterations of the initial agreement or the agreement as revised after the pandemic hit (and after Ms. Rios was aware that footage from the Content Shoot was being used by Fekkai) (UF 20).  Those provisions provided a broad range of rights to Fekkai to use Ms. Rios' name and likeness, and

---

[3] *Jones* supported this statement with the following legal citations: ("*See Newton v. Thomason,* 22 F.3d 1455, 1461 (9th Cir.1994) (granting summary judgment to defendant in right of publicity suit because plaintiff failed to show a lack of consent even though plaintiff never expressly consented but expressed excitement about the use of his likeness and never objected to the use of his likeness over several months); *Hill v. NCAA,* 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 849, 865 P.2d 633 (1994) ("[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant."); Rest.3d Unf. Comp. § 46, cmt. f. ("In the absence of an applicable statute requiring consent in writing, consent can also be implied from conduct or inaction reasonably interpreted as manifesting consent."); Cal. Civ. Code § 3344 (not requiring consent in writing))"

there were no "carve outs" for the Los Angeles Content Shoot or "brand videos." (UF 7 (and see quoted provisions at pp. 5-6 above).

Plaintiff asserted at her deposition that her consent was nonetheless limited and that videos and images from the Content Shoot were outside the scope of the Services Agreement because the Grant of Rights and Cross-Promotion Provision are limited to images "provided" by her and she believes that if someone else took the videos and pictures then she did not "provide" them. UF 16. But the context of these provisions does not support the notion that the word "provided" constitutes a significant limitation on the rights provided, and even taking this word in isolation does not support Plaintiff's argument because the definition of "provided" in itself is broad and would encompass Plaintiff's voluntary appearance in front of many cameras at the Content Shoot knowing she would be filmed and that the images would be used commercially by Fekkai (UF 12): To "provide" means to supply, furnish, or make available. *See* Webster's Third New International Dictionary 1827 (2002) (Webster's Third); American Heritage Dictionary 1411 (4th ed. 2000); 12 Oxford English Dictionary 713 (2d ed. 1989)." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020).[4] Given this definition and the circumstances, the failure of Plaintiff and her lawyer to even attempt to clarify the scope of her consent in the Grant of Rights and Cross-Promotion Provision after the issue of the usage of the footage from the Content Shoot arose provides even further confirmation that her consent did not carve out that footage as she now claims.

Moreover, even if the Services Agreement was somehow not binding or if the videos and photos from the Content Shoot were outside of the Services Agreement, the

---

[4] *See also, e.g., GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1265 n.16 (9th Cir. 2011) ("Webster's Third New International Dictionary 1827 (1986) (provide means to equip, to afford, to yield, and synonyms are supply and furnish); The Oxford English Dictionary 713 (2d ed.1989) (provide means to "[t]o supply or furnish for use; to yield, afford.")).

broad provisions in the Services Agreement still provide evidence of consent. And even aside from the Services Agreement, Ms. Rios' voluntary appearance at the Content Shoot, the knowledge of filming, the knowledge that the footage would be used commercially by Fekkai, the knowledge by early March 2020 that the footage had been and would be used by Fekkai, and the failure to object to any of this until late April 2020 all preclude Ms. Rios, like the plaintiff in *Jones*, from establishing a lack of consent. *Jones*, 815 F. Supp. 2d at 1114-115; UF 15, 18; *Newton*, 22 F.3d at 1461 (expression of excitement that plaintiff would use his name and failure to object to purportedly unauthorized usage for several months after usage became known by plaintiff for several months precluded plaintiff from establishing lack of consent).

As several courts have explained, even if Ms. Rios may have subjectively believed that the use of the footage from the Content Shoot was outside the scope of her consent, those unexpressed subjective beliefs are irrelevant; "consent is measured from Plaintiff's manifested action or inaction.". *Jones*, 815 F. Supp. 2d at 1114, 1115 n. 4; *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1215 (N.D. Cal. 2014) ("The Ninth Circuit has held that for purposes of a common law right to publicity cause of action, '[c]onsent . . . is to be determined objectively from the perspective of a reasonable person.' *Jones v. Corbis Corp.,* 489 Fed. Appx. 155, 156 (9th Cir.2012)"). Utilizing this objective, reasonable person standard along with the undisputed facts described herein, Ms. Rios cannot establish the element of lack of consent to utilize images from the Content Shoot. This is fatal to each of her four claims, and summary judgment should be granted in favor of Defendants and each of those claims.

**II.    In Addition To Failing To Establish A Lack Of Consent, Summary Judgment Should Be Granted To Defendants On Ms. Rios' Lanham Act Claim For The Additional Reason That She Was Already Endorsing The Very Brand That She Now Claims Was Falsely Representing Her Endorsement.**

While the inability to establish a lack of consent is fatal to each of Ms. Rios' claims, her Lanham Act claim for purported false endorsement or sponsorship claim

fails for the additional and independent reason Ms. Rios specifically *did* endorse Fekkai's products. It is axiomatic that a plaintiff asserting a false endorsement claim must not actually endorse the products at issue:

> Unlike the broader right of publicity, which is infringed by the "unpermitted use of a person's identity" containing "no false inference that plaintiff endorses or approves the product," § 1125(a) prohibits only *false endorsement,* not mere use of an image or name. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 28:14 (4th ed.1996) (emphasis added)." (*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1214 (C.D. Cal. 2000))

Here, it is undisputed that Plaintiff specifically agreed to endorse Fekkai's brand and products, was paid handsomely to do so, and indeed pleaded with Fekkai to allow her to do so. UF 3, 4, 5, 6, 21. And indeed, she continued to do so and was paid to do so ever after the alleged unauthorized usage occurred and was known to her. UF 13, 21.

Therefore, her name, image, brand and likeness were already associated with Fekkai and its products even if she somehow did not consent to the specific images arising from the Content Shoot that also promote Fekkai and its products. Therefore, there is no "false" endorsement and no "false" impression that Plaintiff was endorsing or associated with Fekkai and its products—she *was* endorsing and associated with Fekkai and its products. UF 5, 7-10.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment against Plaintiff each and all of her claims.

DATED: May 28, 2021.           SKAGGS FAUCETTE LLP

                               By: _____/s/_____
                                    JASON M. SKAGGS